**E-FILED**
Monday, 16 March, 2015  06:48:36 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| JAY AITKEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 12-cv-1511 |
| vs. | ) | |
| | ) | |
| DEBT MANAGEMENT PARTNERS, LLC, | ) | Magistrate Judge Jonathan E. Hawley |
| AUDUBON FINANCIAL BUREAU | ) | |
| and FANELLI AND ASSOCIATES LLC | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JAY AITKEN'S POST-TRIAL BRIEF**

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 S. Clark Street, Suite 1500
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

# INTRODUCTION

Plaintiff Jay Aitken ("Plaintiff", "Mr. Aitken" or "Jay") is not a sophisticated consumer. He has just two years of college, including a year at a community college. He scanned medical records before becoming a stay-at-home dad. To pay for his wife's doctoral tuition, he took out short-term loans at 403% interest rather than lower-interest student loans. The Fair Debt Collection Practices Act ("FDCPA") was enacted to protect consumers like Jay, consumers who may validly owe a debt, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998), and consumers with "below-average sophistication" who are "especially vulnerable to fraudulent schemes." *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993); *Gammon v. GC Servs. Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir. 1994). So too the Illinois Collection Agency Act ("ICAA"), which declares it the public policy of Illinois "to protect consumers against debt collection abuse." 225 ILCS 425/1; and the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/2 *et seq.* prohibits false and deceptive practices in the course of trade and commerce, including debt collection.

In the Seventh Circuit, claims of debt collection abuse under §1692e of the FDCPA are evaluated from the perspective of the hypothetical unsophisticated consumer, someone who is "'uninformed, naïve, [and] trusting,' but is not a dimwit, has 'rudimentary knowledge about the financial world,' and is 'capable of making basic logical deductions and inferences'." *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012) (citations omitted). The evidence adduced at trial clearly demonstrated that defendant Audubon Financial Bureau ("Audubon") engaged in debt collection abuse in this case, violating both §1692e and §1692c of the FDCPA, 225 ILCS 425/9(a)(11) and (20) of the ICAA, and § 2 of the ICFA.[1]  The FDCPA is a strict liability statute and the Court should enter judgment in favor of plaintiff for both actual and statutory damages.

---

[1]The Court previously held that defendant Debt Management Partners, LLC was liable for any violations of the law committed by Audubon. *Aitken v. Debt Mgmt. Partners, LLC*,  2014 WL 5469876, at *8 (C.D. Ill. Oct. 28, 2014).

1

**FACTS**

On August 3, 2012, Jay Aitken had been his young son Axel's primary caretaker since Axel was born, some sixteen months prior. (Transcript ("Tr.") 126:12-14; 127:10-11). Axel was a rambunctious child who did *not* like to be separated from his father. (Tr. 144:22-25; 145:13-19; Tr. 238:10-15.) In August 2012, Jay was responsible for looking after Axel for all but a half hour a day. His wife, Jill, had a highly stress job at a local hospital, OSF Medical Center (Tr. 127:12-16; 144:12-21); there were no family members in the area to give Jay a break; and Axel's separation anxiety precluded leaving Axel with a babysitter. (Tr. 145:13-19.)

In 2010, Jay obtained a $2,000 short-term, high-interest loan from the Cash Store to pay the tuition for Jill's doctoral program in Audiology. (Tr. 141:2-6.) Although Jay made numerous payments and refinanced the loan at least once, at some point he was unable to continue to make payments due to the loan's high interest (403%) and the accumulation of other financial obligations. (Tr. 128: 8-25; 129:1-18.)

After he stopped making payments, Jay began to receive numerous robo-calls from the Cash Store. (Tr. 177:12-19, 178:16-23.). Jay attempted to work out a payment plan with the Cash Store but only full payment would be accepted. (Tr. 179:20-25; 180:1-4.) He was subsequently called by a debt collection agency, the Bennett Law Firm in Utah, for four to six months. (Tr. 181:18-25.) Jay sought to enter into a payment plan with the Bennett Law Firm, but like the Cash Store, only full payment would be accepted. (Tr. 182:3-8.)

On August 3, 2012, Jay received a call from Audubon. He talked to two individuals who identified themselves as "Monica" and "Frank Salvasio". (Tr: 131:19-21.) Jay talked to Monica first who stated, "You willingly defrauded the Cash Store. That's a Class1 felony. People go to jail for that." (Tr. 132:11-13.) Monica also asked him for his home and employment addresses. (Tr. 132:18-25.) When Jay asked her why she needed these addresses, she responded, "That will be the place where we can kick off the paperwork to have you served." (Tr. 133:1-8.)  Subsequently, Monica transferred Jay to Frank Salvasio (Tr. 133:9-14). Frank Salvasio, identified as an attorney, started

2

the conversation by asking Jay, "Did Monica make you aware of how serious this crime is?" (Tr. 133:10-12; 18-23.) Jay subsequently discussed, *inter alia*, payment arrangements with Mr. Salvasio. (Tr. 135:3-25; 136:1-15.)

When Monica and Frank Salvasio told Jay that non-payment of the debt could lead to criminal prosecution, Jay experienced severe emotional distress. He felt "panicked", "completely shocked", and "totally overwhelm(ed)" (Tr. 145:20-25), because he believed they were telling the truth and if he did not pay the debt he would be arrested and jailed. (Tr. 146:10-17). Jay felt demoralized because he had tried to work out payment arrangements in the past and now he would have to go to jail for not being able to pay the debt:

> My emotional state was just total shock, panic and I was, felt really helpless, like, how can I get, is there any light at the end of the tunnel of this? After the long journey of collection agencies and then now this, it just, it was depressing, it was just . . . .it was horrible.

(Tr. 147:5-14.) Jay was also concerned about the effect his arrest would have on his son:

> I was panicked about the fact that if I was arrested and my child turned over to child protective services, that it would be very traumatizing for him and that it would just be a horrible situation, because I was his main caregiver. We only had one car and, you know, it was just a nightmare.

(Tr. 146:2-9.) Jay experienced "a lot of sleepless nights. I felt very depressed for a while and it was like a whole cloud had come over my life. It was probably one of the worst that I ever felt except with the exception of my father passing unexpectedly." (Tr. 148:24-25; 149:1-4.)

Monica subsequently left voice mails for Jay, including on August 6, 2012 and August 31, 2012. (Tr. 138:15-25; 139:1-21; 141:19-25; 142:1-25; 143:1-10.)

Believing he was going to be arrested, Jay called a local attorney, Patrick Chambers, about arranging the payment of bail. (Tr.150:10-23.) He arranged a plan with his father to drive down from Wisconsin to bail him out. (Tr. 153:19-25; 154:1.) Jay also began trying to be especially frugal in order to have a little money saved for bail. (Tr. 154:24-25; 155:1-4.)

To avoid, or delay, being arrested, Jay engaged in a series of actions to keep a low profile. He took the numbers off his house to make his house, which was hard to find already using GPS,

even harder to locate. (Tr. 157:9-18, 25; 158:1-6.) He decided not to give up his post office box and collected his mail outside of regular hours. (Tr. 158:7-15; 20-25; 159:1-3.) He curtailed his son's music and gym activities so as to minimize the times he was outside the house and might be seen. (Tr. 159:5-16.) He curtailed his gardening in the front of his house for the same reason. (Tr. 159:17-22.) Finally, sometime during the fall of 2012, he asked his postal carrier, Brian Robinson, not to tell people where he lived. (Tr. 160:22-25; 161:3-5.)

In November 2012, Judy Aitken telephoned Audubon and was told by an Audubon employee that Jay owed a debt. (Tr. 50:21-24.)

## ARGUMENT

## I.  AUDUBON VIOLATED THE FDCPA WHEN IT DISCLOSED TO PLAINTIFF'S MOTHER THAT HE OWED A DEBT

### A.  The Evidence Shows That Audubon Disclosed To Judy Aitken That Jay Owed A Debt

Audubon violated § 1692c(b) when it disclosed to Jay's mother, Judy Aitken, that Jay owed a debt. Judy Aitken testified that one afternoon in November 2012 she placed a call to Audubon from her office at ASAP Ministries, the charitable organization that employed her and of which she was the director. (Tr. 45:21-25; 46:1-3; 47:20-25; 48:1-15.) Ms. Aitken talked with a female Audubon employee who, in response to Ms. Aitken's query as to why Audubon was looking for her son, Jay, stated: "[Jay Aitken] owes a debt and he needs to pay the debt." (Tr. 50:21-24.)

Audubon's account history reflects that Audubon received a call from telephone number 269-471-3026 on November 13, 2012 at 4:08 p.m. ASAP Ministries' telephone number is 269-471-3026. (Tr. 48:8-10.) The account history indicates that someone named Brandi Hill took the call and made the notation "NON RPC/No longer works there". (PX 2.) Audubon's representative, Randy Zaffran, testified that that notation means that someone other than the debtor called from a place of employment and that the debtor no longer works there. (Tr. 61:1-15.)

Audubon's cursory account note corroborates Ms. Aitken's testimony that she did in fact place a call to Audubon in November 2012 and that she told the representative that Jay did not work

4

at ASAP Ministries. (Tr. 50:1-25; 51:1.) That the note does not reflect the disclosure to Ms. Aitken that Jay owed a debt is unsurprising; the note does not purport to summarize everything that was said during the conversation and Ms. Hill would hardly disclose that she had violated the FDCPA. Ms. Aitken's testimony was detailed and credible; absent detailed, credible evidence to the contrary, the preponderance of the evidence is that Audubon did disclose to Ms. Aitken that Jay owed a debt.

### B.   It Is A Violation Of The FDCPA For A Debt Collector To Disclose To A Third Party That A Consumer Owes a Debt

Section 1692c(b) of the FDCPA provides that a debt collector cannot disclose information about a consumer to anyone other than "the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector" *unless* the debt collector has "the prior consent of the consumer given directly to the debt collector". 15 U.S.C. § 1692c(b). *Ruth v. Triumph Partnerships*, 577 F.3d 790, 810n6 (7th Cir. 2009); *Fava v. RRI, Inc.* 1997 WL 205336, *6 (N.D. N.Y. 1997 (disclosure of debt to plaintiff's father violated § 1692c(b)); *West v. Costen*, 558 F. Supp. 564, 576 (W.D. Va. 1983) (disclosure of debt to plaintiff's grandparents and uncle violated § 1692c(b)). Audubon's disclosure to Judy Aitken that Jay owed a debt violated § 1692c(b). The Court should enter judgment in favor of plaintiff on this claim.

### II.   AUDUBON VIOLATED THE FDCPA BY REPRESENTING THAT NON-PAYMENT OF THE DEBT COULD SUBJECT PLAINTIFF TO CRIMINAL PROSECUTION

### A.   Jay Talked to Monica on August 3, 2012

Audubon violated §§1692e, e(4), e(7), and e(10) of the FDCPA when it represented to Jay that non-payment of the debt could subject him to criminal prosecution. Jay testified that on August 3, 2012 he talked to two Audubon employees – "Monica" and "Frank Salvasio". (Tr: 131:19-21.) Jay talked to Monica first who stated, "You willingly defrauded the Cash Store. That's a Class1 felony. People go to jail for that." (Tr. 132:11-13.) Subsequently, Monica  transferred Jay to Frank Salvasio (Tr. 133:9-14), who started the conversation by asking Jay, "Did Monica make you aware

of how serious this crime is?" (Tr. 133:10-12; 18-23) and with whom Jay discussed, *inter alia*, potential payment arrangements. (Tr. 135:3-25; 136:1-15.) Audubon's account history corroborates Jay's testimony to the extent that it reflects a conversation was had between Jay and at least one Audubon representative on August 3, 2012 – a male employee actually named Doug Borawski – and that payment arrangements were discussed. (PX 2.)

Jay's testimony that he talked to Monica on August 3 is corroborated by the August 6, 2012 voice message from Monica which acknowledges that she also talked to Jay the previous Friday:

> "Hi, this message is for Jay Aitken. My name is Monica. I'm calling in regards to what *we* had spoken to you about on Friday. Please give our office a call immediately today at 1-888-896-2115., extension 111. Thank you.

(Px 5, emphasis added; Tr. 138:15-25; 139:1-21.) In another voice message left on August 31, 2012, Monica reiterates that she had personally talked with Jay previously:

> Hi. This message is for Jay Aitken. My name is Monica. I'm with the A and B Fraud Division. Jay, um, *I* did speak with you a couple of weeks ago. Um, you stated in a federally recorded line you wanted to take care of this matter. Obviously you had no intentions on taking care of this matter, because we have not spoken with you since. I don't know if you felt that just because we dropped the judgment that you'd be OK, and you wouldn't have to go to court on the account. Um, as of today, if there is not a payment in this office, we will be sending you to court. You will be served at your homestead. If you can make a payment today, please give our office a call at 1-888-506-1740, extension 111.

(PX 6, emphasis added; Tr. 141:19-25; 142:1-25; 143:1-10.) Jay identified the voice on the August 6 and August 31 voice messages as the voice of the person named Monica with whom he spoke on August 3. (Tr: 139:22-25; 140:1-4; 143:11-17.) Based on the August 6 and August 31 voice messages, the reasonable inference is that Jay *did* talk with Monica and that that conversation occurred on August 3. The August 31 message says that Monica had talked with Jay "a couple of weeks ago" but that "we have not spoken with you since." (PX 6.) Jay testified that August 3 was the only day he ever talked with Monica (Tr. 137:21-22; 164:12-16), and the account history confirms that August 3 was the only day on which Jay talked with anyone at Audubon.

That the account history only reflects a conversation between Jay and Doug Borawski on August 3 calls into question the account history's reliability and trustworthiness as a business record.

For if, *arguendo*, Jay did not talk to Monica on August 3, then why does Monica expressly state on August 31 that "I did speak with you a couple of weeks ago". (PX 5.) She could just as easily have said, "Doug Borawski talked with you a couple of weeks ago and I am following up on that conversation". The simpler explanation is that Jay *did* talk to Monica on August 3, the August 6 and August 31 voice messages accurately reflect that fact, and, for whatever reason, the account history does not reflect that fact, calling into question its reliability and trustworthiness as a business record.

Supporting this conclusion is the fact that the account history contains other lacunae, namely Audubon's calls to ASAP Ministries. Judy Aitken testified that the reason she called Audubon was that she received word from her staff that they had been receiving calls for her from Audubon. (Tr. 47:4-9.) When Ms. Aitken telephoned Audubon in November 2012, she explained to the Audubon employee that "we had gotten a lot of calls and I wished that the calls would stop and the harassment of our organization" and "I appealed to her to stop the calls coming into our office." (Tr. 50:21-25; 51:1-25; 52:1-3.)

The account history does not reflect even a *single* call to ASAP Ministries. (PX 2.) But clearly Audubon *did* call ASAP Ministries. Otherwise, *what conceivable reason is there for a single call to be placed from ASAP Ministries to Audubon on November 13, 2012?* The call makes no sense unless, as Judy Aitken credibly testified, ASAP Ministries *had* been receiving numerous calls from Audubon and she had called Audubon in response to those calls. The calls' absence from the call history further call into question its reliability and trustworthiness.

The absence from the account history of *any* calls to ASAP Ministries, Monica's August 6 and 31 voice messages, and Jay's detailed, credible testimony at trial regarding his conversation with Monica on August 3 – all cast doubt on the accuracy and reliability of Audubon's account history and strongly suggest Jay *did* talk to Monica on August 3.[2]

---

[2]Audubon may argue that Jay did not talk to Monica on August 3 because Randy Zaffran identified Monica's voice as being that of Amanda Mottorn and, at her deposition, Ms. Mottorn testified that she did not talk to Jay on August 3. Assuming, ***arguendo***, that Mr. Zaffran accurately identified Monica's voice as that of Ms. Mottorn, the fact is that Ms. Mottorn had no

**B.      Monica Represented to Jay On August 3 That Non-Payment Of The Debt Could Subject Him to Criminal Prosecution**

Jay testified convincingly that Monica said to him, "You willingly defrauded the Cash Store. That's a Class 1 felony. People go to jail for that." (Tr. 132:11-13.) However, the Court need not rely solely on that testimony in determining whether Monica did in fact make those outrageous representations. Monica's August 31 voice message is a particularly egregious violation of the FDCPA; and if Monica was capable of making the kind of statements contained in her August 31 voice message when she knew her statements was being recorded, it is reasonable to believe that on August 3, when she knew she was not being recorded, she made the statements Jay ascribes to her.

In her August 31 voice message, Monica says that she is calling from the "A and B Fraud Division" and that previously Jay had made certain statements on "a federally recorded line". These statements strongly suggest that non-payment of the debt was fraud of major proportions – rising to the level of a federal crime. Further, Monica's blatant threats of a civil suit when no such suit was contemplated  – "I don't know if you felt that just because we dropped the judgment that you'd be OK, and you wouldn't have to go to court on the account. Um, as of today, if there is not a payment in this office, we will be sending you to court. You will be served at your homestead" -- also strongly suggest that, when she knew her statements were not being taped, she could make the bare-knuckles statements to Jay: "You willingly defrauded the Cash Store. That's a Class 1 felony. People go to jail for that."

Because the August 31 voice message corroborates Jay's testimony as to Monica's statements on August 3, it is more likely than not that Monica actually made those statements.

**C.      Monica's Representation That Non-Payment Of The Debt Could Subject Jay to Criminal Prosecution Violated the FDCPA**

Monica's statement on August 3 that non-payment of the debt could subject Jay to criminal

---

particular recollection one way or another as to whether she talked to Mr. Aitken on August 3. She denied talking to Mr. Aitken solely on the basis of her review of the account history. (Amanda Mottern Deposition Transcript, p. 18:17-20.)

prosecution violated §§ 1692e, e(4), e(7), and e(10) of the FDCPA, which provide:

§ 1692e.  False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.

(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer. . . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

Not being able to pay a debt is not a crime of any sort and Illinois residents are not jailed for not paying their debts. *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1329 (7th Cir. 1997);  *Jones v. Kunin*, CIV. 99-818-GPM, 2000 WL 34402017 (S.D. Ill. May 1, 2000).

The representation that Jay could be subject to criminal prosecution constitutes a "false, deceptive, or misleading representation or means in connection with the collection of any debt" and "the use of any false representation or deceptive means to collect or attempt to collect any debt". 15 U.S.C. §§ 1692e and e(10). False statements made by a debt collector in the course of collecting a debt are *per se* violations of §§ 1692e and 1692e(10). "Debt collectors may not make false claims, period." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004); *Gearing v. Check Brokerage Corp.*, 233 F.3d 469, 472 (7th Cir. 2000) (Section 1692e applies even when a false representation was unintentional.").

Monica's statements also violated §§ 1692e(4) and e(7) because she represented that "nonpayment of any debt will result in the arrest or imprisonment of any person" and that Mr. Aitken had "committed any crime or other conduct in order to disgrace the consumer". *Davis v. Commercial Check Control, Inc.*, 98 C 631, 1999 WL 89556, *7 (N.D. Ill. 1999) (letter threatening criminal prosecution violated §§ 1692e, e(4), e(5) and e(10)); *Lensch v. Armada Corp.*, 795 F. Supp.

2d 1180, 1183 (W.D. Wash. 2011). (same).

As in *Davis* and *Lensch,* Monica's false statement that non-payment of a debt could subject Jay to criminal prosecution violated §§ 1692e, e(4), e(7), and e(10). *See also Alonso v. Blackstone Fin. Group, LLC*, No. 1:11 CV 01693 SAB, 2013 WL 6843597, at *13 (E.D. Cal. Dec. 20, 2013) (insinuation that consumer could be arrested for non-payment of a debt constituted, *inter alia*, violations of §§1692e(4), e(7), and e(10)).

## III.    AUDUBON'S THREATS OF CIVIL SUIT VIOLATED THE FDCPA

Jay testified that during their conversation on August 3 Monica asked him for his home and employment addresses. (Tr. 132:18-25.) When Jay asked her why she needed these addresses, she responded, "That will be the place where we can kick off the paperwork to have you served." (Tr. 133:1-8.) This statement was a "false, deceptive, or misleading representation or means in connection with the collection of any debt" and "the use of any false representation or deceptive means to collect or attempt to collect any debt", because Audubon had not at that time brought a civil suit against Jay and had absolutely no intention of doing so in the future. 15 U.S.C. §§ 1692e and e(10).

Monica's statement also violated § 1692e(5) which prohibits "The threat to take any action that cannot legally be taken or that is not intended to be taken. . . . " 15 U.S.C. § 1692e(5). The Court has already granted summary judgment on Jay's claim that Monica violated §1692e(5) of the FDCPA in connection with Monica's false threat of a civil suit in her August 31 voice message. The Court found that there was no evidence that Audubon had a particularized intention to file suit against Jay. *Aitken v. Debt Mgmt. Partners, LLC*, 2014 WL 5469876, at *5 (C.D. Ill. Oct. 28, 2014). For the same  reasons the Court should find that there was no particularized intention to bring a suit against Jay on August 3 when Monica inquired as to Jay's home and business address to allow Audubon to "kick off the paperwork to have you served."

A debt collector makes a threat to take action that is not intended to be taken if the debt collector threatens suit without the intention of actually filing suit. *U.S.  v. Na*t'*l Fin. Servs., Inc.*,

98 F.3d 131, 138 (4th Cir. 1996) (letters threatening suit violated e(5) when debt collector had no intention of filing suit); *Graziano v. Harrison*, 763 F.Supp. 1269, 1280 (D.N.J. 1991) *aff'd in part and rev'd in part on other grounds*, 950 F.2d 107 (3d Cir. 1991) (letter threatening suit if debt not paid within 10 days violated e(5) when suit was not actually filed after 10 day deadline elaspsed ).

Monica's August 3 "kick off the paperwork to have you served" statement also violated § 1692e(2)(A) which prohibits the false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Service in Illinois follows the filing of a suit; Monica's statement that Audubon wanted to serve Jay with process falsely implied that a suit had already by filed. That false implication was a mischaracterization of the legal status of Jay's debt. *Crossley v. Lieberman*, 868 F.2d 566, 571 (3d Cir. 1989) (attorney's letter referring to the creditor as "plaintiff" and demanding "damages and costs" created false impression that a suit had been filed against the consumer".)

Jay testified credibly and in detail regarding Monica's statement, "That will be the place where we can kick off the paperwork to have you served." However, the Court need not rely solely on Jay's testimony when determining whether Monica in fact made that statement. The false statements (discussed above in section IIB) in Monica's August 31 voice message (PX 6) regarding a potential or actual civil suit strongly corroborates Jay's testimony.

## IV.   AUDUBON FAILED TO MEET ITS BURDEN OF PROVING ITS BONA FIDE ERROR DEFENSE

Audubon failed to establish it was entitled to the protection of the bona fide error defense. Section 1692k(c) provides that "A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). To prove the defense, Audubon had to prove that "the violation: (1) was unintentional, (2) resulted from a bona fide error, and (3) occurred despite the debt collector's maintenance of procedures reasonably adapted to avoid such

error." *Ruth v. Triumph Partnerships*, 577 F.3d 790, 803 (7th Cir. 2009). Audubon failed to prove any of these prongs.

To prove the first prong, Audubon had to show that its violations of the FDCPA were unintentional. This is a subjective test which "often can only be shown by inferential evidence." *Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006). The extent to which Monica "should have objectively realized that [her] actions were in violation of law may be inferentially probative of the subjective intentional nature of that violation." *Id.* By this standard, Monica's false, misleading, and deceptive statements on August 3 and August 31 were plainly intentional violations of the FDCPA. Monica's statements were blatant, intentional violations of express, unambiguous provisions of the FDCPA *solely* intended to scare an unsophisticated consumer into paying a debt.

For the same reason, Audubon can't prove the second prong of the bona fide error defense. Monica's violations were not the result of good faith errors, *i.e.*, "a genuine mistake, as opposed to a contrived mistake. *See* Black's Law Dictionary 168 (7th ed.1999) (defining "bona fide" as "1. Made in good faith; without fraud" and "2. Sincere; genuine")." *Kort v. Diversified Collection Servs., Inc*., 394 F.3d 530, 537, 538 (7th Cir. 2005). Likewise, the disclosure of Jay's debt to his mother was not a bona fide error. *Neilson v. Dickerson*, 307 F.3d 623, 641-42 (7th Cir. 2002) (actions taken in "plain contravention" of settled law not entitled to bona fide error defense).

Finally, Audubon failed to prove the third prong of the defense, namely that its procedures were "reasonably adapted to avoid" the errors that resulted in the violations of the FDCPA at issue here. Audubon's representative, Randy Zaffran, testified that, even though the technology existed in 2012, Audubon did not tape its collectors' telephone conversations with debtors and others. (Tr. 112: 4-10.) In 2012, the only safeguard against FDCPA violations was (1) training and (2) Mr. Zaffran – who was responsible for monitoring fifteen collectors simultaneously by walking in and around their cubicles, listening to, and occasionally joining their conversations. (Tr. 77:2-14; 78:2-8; 15-18; 110:18-22.)

That Mr. Zaffran disciplines collectors "all the time" (Tr. 110:1-4) suggests that Audubon's

12

training of collectors is ineffective. Moreover, assuming, again *__arguendo__*, that Monica's voice was that of Amanda Mottorn, the blatant violations of the FDCPA ascribed to Ms. Mottorn occurred when she was far more than a neophyte (Mottorn Dep., 4:8-9), also points to the ineffectiveness of Audubon's training procedures. And the fact that Monica was able to blatantly violate the FDCPA on two separate occasions, together with Brandi Hill's disclosure of Jay's debt to his mother, suggests that Mr. Zaffran's efforts to monitor his collectors by walking around and listening to their conversations is not a procedure "reasonably adapted to avoid" the errors resulting in violations of the FDCPA.

Also problematic is Audubon's policy of allowing collectors to bring cell phones onto the collection floor. Although Mr. Zaffran testified that he had never seen anyone use a phone, clearly some Audubon collectors do use their cell phones for collection purposes. *Vibar v. Audubon Fin. Bureau*, No. 13 CV 659JTC, 2013 WL 5937010, at *1 (W.D. N.Y. Nov. 1, 2013). Collectors' use of cell phones undermines Mr. Zaffran's testimony that *all* collection activity by  Audubon collectors is picked up and reflected in Audubon's account history. (Tr. 68: 17-23)

Finally, Mr. Zaffran testified that Audubon had a policy of not allowing collectors to use aliases. No such policy is reflected in Audubon's written policy and procedure manual. (PX 3.) This raises the question of whether there are other informal policies or procedures which Audubon collectors are required or encouraged to observe which are not reflected in written policy manual. If the manual does not contain all of the relevant policies, it would appear to be of limited utility.

For the foregoing reasons, Audubon has not met its burden of proving its bona fide error defense.

## V.      AUDUBON'S ACTIONS VIOLATED THE ICAA

Audubon's actions violated the Illinois Collection Agency Act, 225 ILCS 425/1 *et seq.* ("ICAA"). The ICAA declares that it is the public policy of Illinois "to protect consumers against debt collection abuse." 225 ILCS 425/1. The Act defines a "debt collector" "as any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt

collection." 225 ILCS 425/2. As such, Audubon is a debt collector as defined in the Act and is subject to the Act's requirements.

It is "well-settled" that the ICAA allows a private right of action. *Stubbs v. Cavalry SPV I, LLC*, 2015 WL 135131, at *5 (N.D. Ill. Jan. 8, 2015); *Grant-Hall v. Cavalry Portfolio Servs.*, 856 F. Supp. 2d 929, 940 (N.D. Ill. 2012). To recover under the ICAA, a plaintiff must prove actual damages. *Id.*, at 940-941; *Stubbs*, 2015 WL 135131, at *5. Emotional distress constitutes actual damages under the ICAA. *Stepney v. Outsourcing Solutions, Inc.*, No. 97 C 5288, 1997 WL 722972, at *5 (N.D. Ill. Nov. 13, 1997); *Sherman v. Field Clinic*, 392 N.E.2d 154 (Ill. App. Ct. 1979).

The ICAA prohibits, *inter alia*, "Threatening to instigate an arrest or criminal prosecution where no basis for a criminal complaint lawfully exists" 225 ILCS 425/9(a)(11) and "Attempting or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist." 225 ILCS 425/9(a)(20). *Sherman v. Field Clinic*, 392 N.E.2d 154, 157 (Ill. App. Ct. 1979) (reversing the dismissal of an ICAA claim which, *inter alia*, claimed that the defendant falsely threatened arrest). Monica's representations that "You willingly defrauded the Cash Store. That's a Class 1 felony. People go to jail for that" violated §§ 9(a)(11) and (20). Jay understood her statements as a veiled threat of criminal prosecution and, as discussed in the next section suffered intense emotional distress as a result.

Accordingly, Audubon violated the ICAA as well as the FDCPA.

## VI.   JAY IS ENTITLED TO DAMAGES FOR AUDUBON'S ACTIONS

### A.   Audubon's Representations Caused Jay Extreme Emotional Distress

When Monica and Frank told Jay that non-payment of the debt could lead to criminal prosecution, Jay experienced severe emotional distress. He felt "panicked", "completely shocked", and "totally overwhelm(ed)" (Tr. 145:20-25), because he believed Monica and Frank Salvasio were telling the truth and that non-payment of a debt could lead to criminal prosecution (Tr. 146:10-17). Jay felt demoralized because  he had tried to work out payment arrangements in the past and now he would have to go to jail for not being able to pay the debt:

> My emotional state was just total shock, panic and I was, felt really helpless, like, how can I get, is there any light at the end of the tunnel of this? After the long journey of collection agencies and then now this, it just, it was depressing, it was just . . . .it was horrible.

(Tr. 147:5-14.) Jay was also concerned about the effect his arrest would have on his son:

> I was panicked about the fact that if I was arrested and my child turned over to child protective services, that it would be very traumatizing for him and that it would just be a horrible situation, because I was his main caregiver. We only had one car and, you know, it was just a nightmare.

(Tr. 146:2-9.) Jay experienced "a lot of sleepless nights. I felt very depressed for a while and it was like a whole cloud had come over my life. It was probably one of the worst that I ever felt except with the exception of my father passing unexpectedly." (Tr. 148:24-25; 149:1-4.)

Jay's emotional distress was not assuaged by his conversation with Audubon's in-house attorney, Frank Salvasio, who began the conversation by asking Jay "Did Monica make you aware of how serious this crime is?" (Tr. 133:10-12; 18-23.) Jay discussed potential payment plans with Frank Salvasio but the only payment plan he could afford was one stretched over one to two years, not the three monthly payments of $700 that Frank Salvasio finally offered. (Tr. 135:3-25.) In order to end the call civilly ("on a good note") (Tr. 195:16-20), Jay told Frank Salvasio that he would discuss Salvasio's proposal with his wife.

Jay did not discuss a three month payment plan with his wife because it was a financial non-starter (Tr. 135:16-25), but also because he did not trust the offer was real. (Tr. 193:13-19.) In August 2012, Jay had been a victim of a bait and switch where he was told he could make a payment of $900, but when he attempted to, he failed (Tr. 187:1-25; 188:1-2). Jay was concerned that Frank Salvasio was "untrustworthy" (Tr. 195:11-15) and offering a similar bait and switch. Above all, because he could not afford three payments of $700, his discussion with Frank Salvasio did not assuage his emotional distress; rather, he ended the call not seeing "a way of out of being arrested and jailed." (Tr. 195:6-10.)

Believing he was going to be arrested and jailed, Jay called a local attorney, Patrick Chambers, about arranging the payment of bail. (Tr.150:10-23.) He arranged a plan with his father

to drive down from Wisconsin to bail him out. (Tr. 153:19-25; 154:1.) Jay also began trying to be especially frugal in order to have a little money saved for bail. (Tr. 154:24-25; 155:1-4.)

To avoid, or delay, being arrested, Jay engaged in a series of actions to keep a low profile. He took the numbers off his house to make his house, which was already hard to find using GPS, even harder to locate. (Tr. 157:9-18, 25; 158:1-6.) He decided not to give up his post office box and collected his mail outside of regular hours. (Tr. 158:7-15; 20-25; 159:1-3.) He curtailed his son's music and gym activities so as to minimize the times he was outside the house and might be seen. (Tr. 159:5-16.) He curtailed his gardening in the front of his house for the same reason. (Tr. 159:17-22.) Finally, sometime during the fall of 2012, he asked his postal carrier, Brian Robinson, not to tell people where he lived. (Tr. 160:22-25; 161:3-5.)

Attorney Patrick Chambers, who Jay contacted on either August 3 or August 6, testified that when he talked to Jay, "I could tell from his voice he was upset and worried." (Tr. 23:1-21.) Likewise, Brian Robinson, Jay's mail carrier, reported that when Jay asked him not to tell anyone where he lived, Jay appeared "scared and just looking out at what was going on around, as if somebody was looking for you." (Tr. 38:14-18.) Jay testified that he talked to his father

Jay's wife, Jill, did not notice that Jay was experiencing emotional distress in the fall of 2012. This is partly explained by the fact that 16+ month old Axel monopolized their attention. (Tr. 238:16-25; 239:1-20.) It is also explained because Jay did not tell her about his conversation with Monica and his fear of arrest until much later. (Tr. 148:4-17.) She worked at a job she experienced as stressful, so stressful that when she got home from work she could only give Jay a short break from his childcare duties. (Tr. 144:12-21.) On weekends she was 'wiped out' and "exhausted" from her job (Tr. 196:9-21) and Jay made the decision not to disclose his conversation with Monica or his fear of arrest to her because he did not "want to add to the stress of her life", did not want it to "cut into her sleep like it was for me" (Tr. 148:14-15), and believed telling her would cause a "nervous breakdown". (Tr. 197:7-16.)

Jay's conversation with Mr. Chambers did *not* ease his emotional distress. It was a short call,

Mr. Chambers sounded like he was in a rush, he asked few questions, and Jay didn't have an opportunity to explain his situation in detail. (Tr. 151:15-16; 152:15-24; 200:6-10.) Mr. Chambers testified that he did *not* tell Jay that he had *nothing* to worry about (Tr. 29:19-23). And so Jay did continue to experience emotional distress after his call to Mr. Chambers.

Jay testified that talks with his father eased his fear of arrest as well as his efforts to keep a low profile. (Tr. 149:10-16.) His fear of arrest did not cease until some time after he *retained* the law firm representing him in this action. (Tr. 149:22-25; 150:1-9.) At trial, Jay's memory was hazy about when he first *contacted* his current counsel (Tr. 211:1-3.), but there is no doubt he had *retained* his counsel as of December 14, 2012, the date the complaint in this action was filed.

### B.      Jay Is Entitled To Actual And Statutory Damages Under the FDCPA

#### 1.      Jay Requests $1,000 In Statutory Damages

The FDCPA provides that a successful plaintiff in an individual action against a debt collector can recover actual damages and statutory damages not to exceed $1,000. 15 U.S.C. § 1692k(a)(1)-(2)(A).  In determining whether to statutory damages, the Court should consider "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b)(1).

Here, Jay is entitled to $1,000 in statutory damages because Audubon's violation of the FDCPA was intentional and egregious. As discussed above, Audubon violated multiple provisions of the FDCPA in connection with the August 3 call, the August 31 voice mail, and the November 13, 2012 disclosure to Judy Aitken that Jay owed a debt. The Court has already found in favor of plaintiff on Monica's violation of § 1692e(5) during her August 31 voice message. Courts in the Seventh Circuit have awarded $1,000 in statutory damages for far less egregious violations of the FDCPA. *Kaylor Trent v. John C. Bonewicz, P.C.*, 910 F. Supp. 2d 1112, 1115 (C.D. Ill. 2012) (awarding $1,000 for single telephone call which failed to disclose the debt collector's identity); *Carlile v. N. Am. Asset Servs., LLC*, No. 10 CV 3234, 2010 WL 5125846, at *2 (C.D. Ill. Dec. 9,

2010) (awarding $1,000 for various violations of the FDCPA); *Raimondi v. McAllister & Associates, Inc.,* 50 F. Supp. 2d 825, 830 (N.D. Ill. 1999) (awarding $1,000 for single letter to plaintiff which threatened to contact plaintiff's employer);

### 2.      Jay Requests $50,000 in Actual Damages

Damages for emotional distress are recoverable under the FDCPA. *Clodfelter v. United Processing, Inc.*, No. 08-CV-2131, 2008 WL 4225557, *4 (C.D. IL. 2008). To recover for emotional distress under the FDCPA, a plaintiff is not required to establish meet the standards of a state law claim for intentional infliction of emotional distress. *Thomas v. Boscia*, No. 1:08CV42WTLTAB, 2009 WL 2778105, at *6 (S.D. Ind. Aug. 28, 2009). Rather, a plaintiff need only "'explain the circumstances of his injury in reasonable detail' and not rely on conclusory statements, unless the 'facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action'." *Wantz v. Experian Info. Solutions*, 386 F.3d 829, 834 (7th Cir. 2004), as amended (Nov. 16, 2004) (citations omitted); *Clodfelter*, 2008 WL 4225557, at *4. Here, as discussed in Section VIA above, Jay explained at length at trial why he experienced emotional distress at the representation that he could be subject to criminal prosecution for non-payment of his debt.

In *Clodfelter*, the defendant stated to the plaintiff's father, stepmother, brother, mother and stepfather that the plaintiff would be prosecuted or arrested. *Id.* at *2. The defendant also told the plaintiff's employer that a sheriff would be arriving with an affidavit for the plaintiff's arrest. *Id.* The defendant threatened the plaintiff with criminal prosecution and told him "she was on the other line with the Coles County State's Attorney, and told him to expect a knock at his door." *Id.* The plaintiff felt 'sick", "worried" and "embarrassed" at the defendant's behavior. *Id.* at *5. The court awarded the plaintiff $100,000 in actual damages, finding that the plaintiff's affidavit "sufficiently shows actions that are so 'inherently degrading' that this court can reasonably infer that Plaintiff suffered emotional distress" from the defendant's actions. *Id. See also Gard v. B & T Fin. Servs.*, LLC, No. 2:12 CV 005 JD, 2013 WL 228816, at *2 (N.D. Ind. Jan. 22, 2013), (awarding $25,000 in emotional

distress damages to plaintiff threatened with criminal prosecution); In *Lapland v. Willow Brookes Solutions, Inc*., No. 3:14CV1665, 2015 WL 1057501, at *4 (N.D. Ind. Mar. 10, 2015) (same); *Pinkstaff v. Lenahan*, 2:08-cv-02131-MPM-DGB (S.D. Ill.) (Appendices A and B hereto), (awarding two separate plaintiffs $15,000 each for emotional distress in connection with threat of criminal prosecution).

Here, Jay suffered intense emotional distress at the prospect of being arrested. As his son's primary caretaker, he was fearful that his 16+ month old son could be traumatized by becoming separated from him, potentially ending up for a time with child protective services. Jay did not just testify about the distress he felt; he testified about actions he took to arrange bail and keep a low profile – actions strongly supporting his claim of genuinely intense emotional distress. Under the facts of this case, and based on the precedents discussed above, Jay believes an award of $50,000 in emotional damages is warranted.

### C.    Jay Is Entitled To Actual And Punitive Damages Under the ICAA

Compensatory and punitive damages are available under the ICAA. *Sherman v. Field Clinic*, 392 N.E.2d 154 (Ill. App. Ct. 1979):

> [Nothing in the Act indicates an intent to limit the remedies available to those, administrative or criminal, enumerated in the Act.
> . . . .
>
> [T]the Collection Agency Act provides a deterrent in addition to compensatory damages and criminal sanctions, that of possible suspension or revocation of the offending collection agency's license. Yet it was the unlikelihood that existing criminal and administrative remedies would truly deter which led us to found a cause of action for damages on the statute; the same factor militates in favor of the availability of the additional sanction of punitive damages, particularly in view of the fact that criminal and administrative sanctions will not operate as against those who hired the collection agency and possibly sanctioned or directed the oppressive conduct. On balance we believe that punitive damages should be available for violations of section 9 of the Collection Agency Act, both generally and in the instant case.

*Sherman v. Field Clinic*, 74 Ill. App. 3d 21, 31, 392 N.E.2d 154, 161, 162 (1979). *Sherman* involved, *inter alia*, a claim similar to that alleged here, namely a "baseless threat of arrest or criminal prosecution." *Id.* at 160.

Unlike the FDCPA, there does not appear to be published cases in which an award of compensatory or punitive damages has actually been awarded to a successful plaintiff. As with the FDCPA, Jay seeks $50,000 in compensatory damages under the ICAA and treble that amount or $150,000 in punitive damages.

### D.     Jay Is Entitled To Actual And Punitive Damages Under the ICFA

Audubon violated the ICFA which prohibits unfair and deceptive acts and practices in the course of trade or commerce. 815 ILCS 505/2. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. at 244-45 n. 5; *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 418, 775 N.E.2d 951, 960-961 (Il. 2002). Debt collectors are subject to the Act. *People ex rel. Daley v. Datacom Sys. Corp.*, 146 Ill. 2d 1, 30, 585 N.E.2d 51, 64 (1991)

Actual damages are recoverable under the Act. 815 ILCS 505/10a. *Osborne v. J.R.S-1*, 949 F.Supp.2d 807, 813 (N.D. Ill. 2013). Actual damages can take the form of pecuniary damages and emotional distress damages. *Worix v. MedAssets, Inc*., 869 F. Supp. 2d 893, 900 (N.D. Ill. 2012). Punitive damages are also available under the Act. *Kirkpatrick v. Strosberg*, 894 N.E.2d 781, 789 (Ill. App. Ct 2008) (awarding nominal actual damages and $300,000 in punitive damages in a construction case).  Here, plaintiff testified that after he learned from Monica and Frank Salvasio that he could be subject to criminal prosecution, he began setting aside money to pay bail. (Tr. 154:24-25; 155:1-4.) The money he set aside constitutes sufficient pecuniary damages under the ICFA; as discussed above, he also suffered emotional distress damages. As with the ICAA, plaintiff seeks $50,000 in emotional distress damages and $150,000 in punitive damages.

### CONCLUSION

For the foregoing reasons, plaintiff respectfully asks the Court to enter judgment in his favor on all remaining counts and award the damages requested. Assuming judgment is entered in plaintiff's favor, plaintiff also requests leave to file a petition for attorney's fees and costs.

Respectfully submitted,

/s Francis R. Greene
Francis R. Greene

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 S. Clark Street, Suite 1500
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

## CERTIFICATE OF SERVICE

I, Francis R. Greene, hereby certify that on March 16, 2015, I caused to be electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following party via electronic mail:

Thomas P. Needham
tpm@needhamlaw.com

s/Francis R. Greene
Francis R. Greene