IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JAY AITKEN,
    Plaintiff,

v.

DEBT MANAGEMENT PARTNERS,
LLC, et al.,
    Defendants.

Case No. 1:12-CV-01511

### Order

On February 9, 2015, this matter came before the Court for a bench trial[1] on Plaintiff, Jay Aitken's (Aitken) claims against Defendants Debt Management Partners, LLC (DMP) and Audubon Financial Bureau (Audubon).[2] Plaintiff sued Audubon and DMP, alleging violations of the Fair Debt Collection Practices Act (FDCPA), the Illinois Collection Agency Act (ICAA), and the Illinois Consumer Fraud Act (ICFA).  Following cross-motions for summary judgment, this Court found that Defendants violated the FDCPA in a voice mail that Audubon left for Plaintiff on August 31, 2012. After summary judgment, the following issues remained for trial: (1) whether an employee of Audubon identifying herself as "Monica" falsely claimed that Plaintiff could be jailed or sued during a phone call on August 3, 2012; (2) whether Audubon violated the FDCPA and the ICFA by disclosing Plaintiff's debt to his mother, Judy Aitken; and (3) whether the Plaintiff was entitled to any damages. After the bench trial, this Court ordered

---

[1] The parties consented to proceeding before a U.S. Magistrate Judge. (D. 27; D. 29).
[2] In its Order on summary judgment, this Court held that DMP is liable for the actions of Audubon. (D. 54 at ECF p. 13). The Court will therefore, refer only to Audubon's actions herein, unless there is a particular need to distinguish between the two Defendants.

1

the parties to submit post-trial briefs with proposed findings of fact and conclusions of law. The Court having considered the evidence and argument presented at the bench trial, as well as the post-trial briefs of the parties, this matter is now ripe for decision. Parts I and II of this Order address the questions of fact and law relevant to the question of liability, and Part III of this Order address the questions of fact and law relevant to damages.

# I
## A

The Court finds the following facts relevant to liability.

In January 2010, Plaintiff borrowed $2,000 from a payday loan business called the Cash Store. Plaintiff took out a number of high-interest loans around this time, and sometimes borrowed from three different payday loan stores at once, including the Cash Store. Plaintiff stopped repaying the Cash Store loan in late 2010 or early 2011. The Cash Store and a collection company called the Bennett Law Firm began calling Plaintiff about his delinquent loan, demanding repayment in full. DMP then purchased Plaintiff's delinquent Cash Store loan, and in July 2012, placed it with Audubon for collection.

## B

A critical fact in dispute at trial is exactly what transpired during an August 3, 2012 telephone call between Aitken and Audubon.

At trial, Plaintiff introduced into evidence an "account history log" from Audubon, which is a computerized record that is supposed to document everything Audubon did to collect Plaintiff's Cash Store debt. (Plaintiff's Exhibit #2; D. 68-3). This log has an entry for August 3, 2012, which notes that Audubon employee, Amanda Mottorn, "contacted Debtor." That same entry then notes, "Other,"with what appears to be a notation by a Manager named "Doug," which indicated that the Plaintiff agreed to settle the account for four payments of $510,

subject to his discussing the arrangement with his wife. The Debtor would contact Audubon with the "results" the next Monday. Id. "Doug" referenced in the log was Doug Borawski, an Audubon manager.

Contrary to what the log indicates, the Plaintiff testified that the following occurred on the August 3, 2012 telephone call with Audubon. According to the Plaintiff, he talked with two individuals who identified themselves as "Monica" and "Frank Salvasio." Aitken talked to Monica first, who stated, "You willingly defrauded the Cash Store. That's a Class 1 felony. People go to jail for that." Monica also asked him for his home and employment addresses. When Aitken asked her why she needed these addresses, she responded, "That will be the place where we can kick off the paperwork to have you served." Subsequently, Monica transferred Aitken to Frank Salvasio. Frank Salvasio, identified as an attorney, started the conversation by asking Aitken, "Did Monica make you aware of how serious this crime is?" Aitken then discussed payment arrangements with Mr. Salvasio.

The Court finds by a preponderance of the evidence that Aitken's version of what transpired during the August 3, 2012 telephone call is the more likely version of what actually happened. First, it is undisputed that neither a "Monica" nor "Frank Salvasio" worked for Audubon during the relevant time period. Nevertheless, it is also undisputed that on August 31, 2012, Amanda Mottorn, using the name "Monica," left the following voice message for Aitken stating as follows:

> Hi. This message is for Jay Aitken. My name is Monica. I'm with the A and B Fraud Division. Jay, um, I did speak with you a couple of weeks ago. Um, you stated in a federally recorded line you wanted to take care of this matter. Obviously you had no intentions on taking care of this matter, because we have not spoken with you since. I don't know if you felt that just because we dropped the judgment that you'd be OK, and you wouldn't have to go to court

> on the account. Um, as of today, if there is not a payment in this office, we will be sending you to court. You will be served at your homestead. If you can make a payment today, please give our office a call at 1-888-506-1740, extension 111.

This voice message corroborates a number of facts consistent with Aitken's version of events. The message confirms that Amanda Mottorn, using the fictitious name "Monica," previously spoke with Aitken. The only date prior to the voice message which the log shows someone made actual contact with Aitken was on August 3, 2012. Mottorn claims to be calling from the "A and B Fraud Division," a representation which is consistent with Aitken's claim's regarding the August 3, 2012 telephone call referencing criminal conduct. Although Mottorn indicated in her deposition that she did not speak to Aitken at all on August 3, 2012, and implied that Borawski alone must have spoken with Aitken while logged into the computer under her name, this cannot be true, for the August 31 voice message is clear that *she* spoke to Aitken previously. And, as already noted, August 3 was the *only* date prior to the August 31 voice message when the log indicates anyone spoke to Aitken personally.

Likewise, the log itself at least in part corroborates Aitken's version of events to the extent that Aitken claimed to speak to both a man and a woman during the August 3 telephone call. The log indicates Aitken indeed spoke to a man and woman during that call, Borawski and Mottorn, and, given the fact that Mottorn indisputably used the fictitious name "Monica" during the August 31 voice message, one can reasonably infer that she used the same fictitious name during the August 3 telephone call, along with Borawski using the fictitious name of Frank Silvasio.

The Court notes that if the only evidence supporting Aitken's version of what transpired during the August 3 telephone was Aitken's testimony *alone*,

then Aitken would have failed to meet his burden, given Aitken's lack of credibility, as discussed, *infra*. However, the other facts noted which corroborate portions of Aitken's testimony are enough to tip the balance in his favor on this question of fact, although just barely.

## C

The other telephone call at issue is a telephone call made by Aitken's mother, Judy Aitken, to Audubon on November 13, 2012. Audubon's account history reflects that Audubon received a call from telephone number (269) 471-3026 on November 13, 2012 at 4:08 p.m. This is the number of ASAP Ministries, where Judy Aikten worked at the time. The account history indicates that someone named Brandi Hill took the call and made the notation "NON RPC/No longer works there." Audubon's representative, Randy Zaffran, testified that this notation means that someone other than the debtor called from a place of employment and that the debtor no longer works there.

Judy Aitken testified that she made this call to Audubon in response to a note she received from co-workers which indicated calls had come in for her at her place of employment. When she called Audubon, she reached a woman who identified herself, although Judy Aitken could not remember the name the woman used. According to Judy Aitken, after the Audubon employee asked if she was related to the Plaintiff and if she knew where he was, Judy Aitken asked, "What is the problem?" (Tr. at p. 50). The employee then responded, "He owes a debt and he needs to pay the debt." Id.

The Court finds by a preponderance of evidence that, as testified to by Judy Aitken, the Audubon employee stated to her that the Plaintiff "owes a debt." First, the Court finds Judy Aitken to be a credible witness. She was clear in her testimony, her demeanor supported the credibility of her testimony, and her testimony was internally consistent. The Defendant's cross-examination of her

did nothing to effectively call her credibility into question. Second, Audubon's own account history corroborates that Judy Aitken made a call to Audubon. The fact that Judy Aitken called Audubon and had the telephone number to do so corroborates her version of events. Likewise, the account history corroborates that a woman from Audubon spoke with Judy Aitken as she testified. Finally, although the account history does not state that Audubon disclosed that the Plaintiff owed a debt to Judy Aitken, it is undisputed that the account history is not a verbatim account of every word said during a phone call.

## II

Given the Court's findings of what transpired during the two calls in question, the Court will now address whether these facts amount to a violation of the law as claimed in the Plaintiff's Complaint.

## A

Regarding Audubon's statement that Aitken's failure to pay his debt could subject him to criminal prosecution, the FDCPA provides in relevant part:

> § 1692e. False or misleading representations
>
> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> ***
>
> (4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .
>
> ***

> (7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer. . . .
>
> ***
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

15 USC §1692e. Not being able to pay a debt is not a crime of any sort and Illinois residents are not jailed for failing to pay their debts. See *Bass v Stolper, Koritzinsky, Brewster & Neider, SC*, 111 F3d 1322, 1329 (7th Cir 1997) ("Appellants misstate the law when they categorize all dishonored checks as criminal and tortious"); IL Const Art 1, § 14 ("No person shall be imprisoned for debt unless he refuses to deliver up his estate for the benefit of his creditors as provided by law or unless there is a strong presumption of fraud"). The representation that the Plaintiff committed a crime constitutes a "false, deceptive, or misleading representation or means in connection with the collection of any debt" and "the use of any false representation or deceptive means to collect or attempt to collect any debt." 15 USC §§ 1692e and e(10). False statements made by a debt collector in the course of collecting a debt are *per se* violations of §§ 1692e and 1692e(10). "Debt collectors may not make false claims, period." *Randolph v IMBS, Inc*, 368 F3d 726, 730 (7th Cir 2004); *Gearing v Check Brokerage Corp*, 233 F3d 469, 472 (7th Cir 2000) ("Section 1692e applies even when a false representation was unintentional").

"Monica's" statements also violated §§ 1692e(4) and e(7) because she represented that "nonpayment of any debt will result in the arrest or imprisonment of any person" and that Mr. Aitken had "committed any crime or other conduct in order to disgrace the consumer."

7

Audubon's conduct during the August 3 telephone call also violates subsection (5) of 1692e. In its Order on summary judgment, this Court previously held that the August 31 telephone call violated this provision, finding that there was no genuine dispute of fact that Audubon never intended to use legal action to collect the debt from the Plaintiff. However, regarding the August 3 telephone call, the Court found a genuine dispute existed regarding what transpired during that call and, consequently, summary judgment on that question was denied. (D. 54 at ECF pp. 8-10).

Having now found that Aitken's version of the August 3 telephone call is the more likely than not version of events, it necessarily follows that Audubon's threat to take legal action during that telephone call violates Section 1692e(5) for the same reasons found in the Court's summary judgment Order with respect to the August 31 telephone call. At both the summary judgment and trial stages of this case, Audubon presented no evidence that it ever intended to take legal action to collect the Plaintiff's debt.

Accordingly, Audubon's conduct during the August 3, 2012 telephone call with the Plaintiff violates 15 USC § 1692e(4), e(5), e(7), and e(10).

## B

Regarding the November 13, 2012 telephone call between Audubon and Judy Aitken, Section 1692c(b) of the FDCPA provides:

(b) Communication with third parties

> Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by

> law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

Judy Aitken's testimony establishes that Audubon violated this provision of the FDCPA when it disclosed to her, without the Plaintiff's consent, that the Plaintiff owed them a debt.

Accordingly, Audubon's conduct during the August 31, 2012 telephone call with Judy Aitken violates 15 USC § 1692c(b).

### C

Regarding the August 31, 2012 telephone call, this Court previously found in its Order on summary judgment that Audubon's conduct violates 15 USC §1692e(5).

### D

The Defendant asserts that, even if it engaged in the conduct as alleged by Aitken and as now found by this Court, it has proved by a preponderance of the evidence that it may avoid liability due to the bona fide error defense. (D. 68 at ECF pp. 8-9). Section 1692k(c) of the FDCPA provides that "[a] debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 USC § 1692k(c). To prove the defense, Audubon had to prove that "the violation: (1) was unintentional, (2) resulted from a bona fide error, and (3) occurred despite the debt collector's maintenance of procedures reasonably adapted to avoid such error." *Ruth v Triumph Partnerships*, 577 F3d 790, 803 (7th Cir 2009). Audubon failed to prove any of these prongs.

To prove the first prong, Audubon had to show that its violations of the FDCPA were unintentional. This is a subjective test which "often can only be

9

shown by inferential evidence." *Johnson v Riddle*, 443 F3d 723, 728 (10th Cir 2006). The extent to which Monica "should have objectively realized that [her] actions were in violation of law may be inferentially probative of the subjective intentional nature of that violation." Id at 729. By this standard, Monica's false, misleading, and deceptive statements on August 3 and August 31 were plainly intentional violations of the FDCPA. Monica's statements were blatant, intentional violations of express, unambiguous provisions of the FDCPA intended to scare an unsophisticated consumer into paying a debt.

For the same reason, Audubon cannot prove the second prong of the bona fide error defense. Monica's violations were not the result of good faith errors, *ie*, "a genuine mistake, as opposed to a contrived mistake." See Black's Law Dictionary 168 (7th ed 1999) (defining 'bona fide' as '1. Made in good faith; without fraud' and '2. Sincere; genuine')." *Kort v Diversified Collection Services, Inc*, 394 F3d 530, 538 (7th Cir 2005). Likewise, the disclosure of Aitken's debt to his mother was not a bona fide error. *Neilson v Dickerson*, 307 F3d 623, 641-42 (7th Cir 2002) (actions taken in "plain contravention" of settled law not entitled to bona fide error defense).

Finally, Audubon failed to prove the third prong of the defense, namely that its procedures were "reasonably adapted to avoid" the errors that resulted in the violations of the FDCPA at issue here. Audubon's representative, Randy Zaffran, testified that, even though the technology existed in 2012, Audubon did not tape its collectors' telephone conversations with debtors and others. In 2012, the only safeguard against FDCPA violations was (1) training and (2) Mr. Zaffran – who was responsible for monitoring fifteen collectors simultaneously by walking in and around their cubicles, listening to, and occasionally joining their conversations.

That Mr. Zaffran disciplines collectors "all the time" suggests that Audubon's training of collectors is ineffective. Moreover, the blatant violations of the FDCPA ascribed to Ms. Mottorn acting while using the name "Monica" occurred when she was far more than a neophyte also points to the ineffectiveness of Audubon's training procedures. And the fact that Monica was able to blatantly violate the FDCPA on two separate occasions, together with Brandi Hill's disclosure of Aitken's debt to his mother, suggests that Mr. Zaffran's efforts to monitor his collectors by walking around and listening to their conversations is not a procedure "reasonably adapted to avoid" the errors resulting in violations of the FDCPA.

For the foregoing reasons, Audubon has not met its burden of proving its bona fide error defense.

### E

The Plaintiff also alleges that Audubon's conduct violations the ICAA, 225 ILCS 425/1 *et seq* and the ICFA, 815 ILCS 505/2. Given the findings of fact this Court has made, the same conduct which violates the FDCPA violates both of these Illinois Acts as well. However, as set forth in more detail below, because Aitken has failed to establish actual damages, he cannot recover any damages under either of these Illinois Acts.

### III

On the question of damages, the questions before the Court are: 1) the amount, if any, in statutory damages under the FDCPA to which Aitken is entitled; 2) the amount, if any, of actual damages to which Aitken is entitled; and 3) the amount, if any, of punitive damages under the ICAA to which Aitken is entitled.

## A

The FDCPA provides that a successful plaintiff in an individual action against a debt collector can recover actual damages and statutory damages not to exceed $1,000. 15 USC § 1692k(a)(1)-(2)(A). In determining whether to award statutory damages, the Court should consider "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 USC § 1692k(b)(1).

Here, Aitken is entitled to $1,000 in statutory damages because Audubon's violation of the FDCPA was intentional and egregious. As discussed above, Audubon violated multiple provisions of the FDCPA in connection with the August 3 call, the August 31 voice mail, and the November 13, 2012 disclosure to Judy Aitken that the Plaintiff owed a debt. The Court has already found in favor of plaintiff on "Monica's" violation of § 1692e(5) during her August 31 voice message. Courts in the Seventh Circuit have awarded $1,000 in statutory damages for far less egregious violations of the FDCPA. *Kaylor-Trent v John C. Bonewicz, PC*, 910 F Supp 2d 1112, 1115 (CD Ill 2012) (awarding $1,000 for single telephone call which failed to identify the caller's identity and to disclose that the communication was from a debt collector); *Carlile v North American Asset Service, LLC*, 2010 WL 5125846, *2 (CD Ill) (awarding $1,000 for various violations of the FDCPA); *Raimondi v McAllister & Associates, Inc*, 50 F Supp 2d 825, 830 (ND Ill 1999) (awarding $1,000 for single letter to plaintiff which threatened to contact plaintiff's employer). In other words, the number of violations, the multiple provisions of the FDCPA which those violations contravened, and the serious nature of telling a debtor that his failure to pay a debt is a felony, support in combination an award of statutory damages at the $1,000 cap.

**B**

A Plaintiff may also recover actual damages for violations of the FDCPA, ICCA, and the IFCA, and such actual damages may include emotional distress. See 15 USC § 1692k(a); 815 ILCS 505/10a; *Osborne v JRS-I, Inc,* 949 F Supp 2d 807, 813 (ND Ill 2013); *Clodfelter v United Processing, Inc,* 2008 WL 4225557, *4 (CD Ill 2008); Bassett v IC System, Inc, 715 F Supp 2d 803, 811-12 (ND Ill 2010); *Sherman v Field Clinic,* 392 NE2d 154, 161 (Ill App 1979).

Aitken seeks $50,000 in actual damages due to extreme emotional distress caused by his fear of criminal prosecution for his failure to pay his debt. Aitken testified that for six months after the calls in August of 2012, his extreme emotional distress due to his fear of arrest continued. (D. 70 at ECF p. 211). Aitken also testified to various actions he took which, according to him, evinced his fear of arrest during this period. Aitken's testimony regarding his emotional distress due to a fear of arrest or criminal prosecution is, however, not credible and, consequently, he has failed to establish any actual damages by a preponderance of the evidence.

Specifically, it is undisputed that the call referencing criminal conduct occurred on August 3, 2012. Attorney Patrick Chambers credibly testified that no later than August 6, 2012, Aitken contacted him regarding the debt Audubon was seeking to collect. (D. 70 at ECF p. 22). In other words, at most, Aitken contacted Chambers within three days of the August 3, 2012 telephone call from Audubon.

During the conversation between Chambers and Aitken, Chambers testified that Aitken was upset and indicated that if he did not pay his debt then "something was going to happen to him." (D. 70 at ECF p. 23). Chambers did not have a more specific recollection of what that "something" might be, although Aitken testified he asked if Chambers could arrange bail if he were

13

jailed in relation to his debt. (D. 70 at ECF p. 150). Chambers said that whatever it was that Aitken was worried about, he told Aitken it was not permitted under Illinois law or the FDCPA. (D. 70 at ECF p. 30-31). At the end of the conversation, Chambers testified that the he said the following:

> At the end of it I, I said that would not be allowed under the Fair Debt Collection Act. But I don't work in that area, but I can give you a phone number of a firm that works in consumer protection cases, and he said he wanted that. I gave him the phone number and I wished him good luck.

(D. 70 at ECF p. 24). The number given by Chambers to Aitken was the number of the firm which presently represents Aitken in the case at bar (D. 70 at ECF p. 25). Although at trial Aitken testified that he contacted that firm within a matter of "weeks" after the call with Chambers, he testified during his April 3, 2014 deposition that it was a "matter of days, if that" and "[i]t was fairly quickly that I was able to make contact, I believe." (D. 70 at ECF p. 204-205).

In other words, no more than three days after the August 3, 2012 telephone call, Aitken had contact with an attorney who told him that what he was worried about was not allowed under Illinois law or the FDCPA. Within very short order, he was then in contact with his present counsel, experienced litigators of FDCPA claims.

Despite the reassurances from Chambers, and the reasonable inference of similar reassurance from the firm presently representing him, Aitken testified that his extreme emotional distress due to his fear of arrest continued for nearly six months, he testifying that "[i]t took me a while for me to come to the understanding – in fact, early March – that the likelihood of me being arrested was slim," even though the case at bar was filed in *December*. (D. 70 at ECF p. 213). This testimony is preposterous, and Aitken's testimony as to his extreme emotional distress is incredible.

No reasonable person, having been advised by an attorney within at most three days of the offending telephone call that an arrest for failure to pay a debt was prohibited by Illinois and Federal law, and thereafter within days being again so advised by a firm which practices in FDCPA litigation, could have feared arrest or prosecution for failure to pay a debt. Even more so could no reasonable person continuie to harbor such fears for an additional three months after this case was filed specifically alleging that the threat of criminal prosecution violated Illinois and Federal law. The testimony is quite simply unbelievable and so preposterous to make all his other testimony about his alleged damages completely unreliable.

Nor did the testimony of Aitken's wife, Jill Aitken, in any way support his testimony; she could not corroborate any of Aitken's claims of distress, during the relevant time period not recalling phone calls from collectors coming to the house, never hearing any recorded messages regarding debts, never noticing any unusual behavior on the part of her husband, never finding him to seem irritable, never noticing any normal sleep interruption except for that due to their child awakening him, never experiencing marital strife, and never being told by Aitken that he feared being arrested until *after* this lawsuit was filed, more than five months after the August 3, 2012 telephone call.

Finally, the testimony of Aitken's letter carrier, Brian Robinson, does not alter the Court's credibility analysis. (D. 70 at ECF pp. 33-43). Robinson testified that some time during the Fall of 2012, he had a conversation with Aitken out by his mailbox. Robinson testified that Aitken asked "if anybody had been looking for him or anybody in the area had been asking about him." (D. 70 at ECF p. 38). He also stated that Aitken's demeanor was "very scared and just looking out at what was going on around, as if somebody was looking for him." (D. 70 at ECF p. 38). Given the ambiguity regarding the precise time period and the lack of

15

specificity as to why Aitken may have been scared and looking around, there simply is not enough evidence to demonstrate that this lone incident was linked directly to the August 3, 2012 telephone call.[3]

In sum, given that the evidence on actual damages was almost entirely Aitken's testimony and given that Aitken's testimony was incredible, the Plaintiff has failed to establish by a preponderance of the evidence that he has actual damages of any sort under the FDCPA, ICCA, and IFCA.

Given Aitken's failure to establish actual damages, the Court concludes that punitive damages under the ICAA and ICFA are not warranted in this case, especially in light of Aitken's incredible testimony concerning his alleged actual damages.

### IV

As set forth, *supra*, the Defendant is found liable for violating the FDCPA, ICCA, and IFCA. The Plaintiff is awarded $1,000 in statutory damages, but no actual, compensatory, or punitive damages.

Because the FDCPA requires an award of costs and attorney's fees to the successful consumer, the Plaintiff shall submit a petition for fees and costs on or before 30-days from the date of this Order. 15 USC § 1692k(a); *Tolentino v Friedman*, 46 F3d 645, 651 (7th Cir 1995). In preparing such petition, the Court directs the Plaintiff to be mindful of *Kaylor-Trent v Bonewicz, PC*, 916 F Supp 2d 878 (CD Ill 2013).

So Ordered.

Entered on April 17, 2015

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE

---

[3] Aitken produced no evidence to support a finding of actual damages stemming from the November telephone between his mother and Audubon.